NATIONAL TRADERS BANK and others, in equity,

*vs*

OCEAN INSURANCE COMPANY.

*Equity. Mistake—what is sufficient proof to authorize the court to reform an instrument.*

When an insurance company undertakes to insure the charter of a vessel after being informed that no copy of the charter has been received, and it is not known how many ports she will be required to use, and through mistake the policy is so written as to limit the vessel to the use of one port, when in fact her charter requires her to use two, a court of equity will order the policy reformed so as to describe the voyage correctly.

BILL IN EQUITY. The complainants seek to have an insurance policy issued by the Ocean Insurance Company upon the barque

Maria Henry, of which they are the owners, reformed so as to express what they allege to have been the intention of both parties at the time it was made, which (as written) it now fails to do, owing to a mistake in filling it out, as they say.

On the fifth day of April, 1866, at Liverpool, Eng., the master of the vessel chartered her to take a cargo to some place in Cuba "and there, or at some other usual place in the island be made ready and adapted to take on board a full and complete cargo * * * which the said charterer binds himself to ship * * * and the master is bound to receive, and being so loaded and dispatched shall proceed to Queenstown or Falmouth for orders, &c., &c. She proceeded to St. Jago with coal and then went to Mansanilla (both places being in the island of Cuba) where she loaded with timber and sailed for Falmouth, Eng., for orders, as per charter. While on this voyage, and after reaching a point where the routes from St. Jago and from Mansanilla to Falmouth are identical, the vessel was lost through perils insured against. The Company refusing to pay the sum by them insured on the vessel, ($5000) an action at law was brought against them, which they defended successfully on the ground of deviation, the policy as actually issued and delivered only covering a voyage "at and from Liverpool to port of discharge in Cuba, and at and thence to port of advice and discharge in Europe." The complainants set out in their bill that the ship's husband, (Hearne) in behalf of all the owners, agreed with the president of the company, acting and authorized to act in its behalf, for an insurance of $5000, on the whole round charter aforesaid, valued at $16,000, and then and there, at the office of said company, (the said Hearne) informed William W. Woodbury, the president of the company * * * that the vessel was chartered for a round voyage to Cuba and back to Europe, and to go to Falmouth for orders where to discharge * * * that said Hearne had not received a copy of the charter-party, and did not know at what port in Cuba the vessel would discharge or to what port she would go to load; that said Woodbury replied that he would give him (Hearne) a policy for five

thousand dollars that would cover the round voyage, at the same rates of premium as charged by the New England, or any other good office in Boston; that he would make it all right. To this Mr. Hearne assented, and on the eighth day of May, in the same year, called for the policy," which is the one now sought to be reformed.

At that time, the complainants aver, Mr. Woodbury produced a premium note for Hearne's signature, dated May 8, 1866, for $251.50, payable in six months, being five per cent. on the sum insured, and a dollar and a half for the policy. Hearne demurred to the rate charged and Woodbury replied, "you don't know how many ports in Cuba will have to be used; the policy is to cover the round voyage. You sign the note and we will make it all right as we agreed." Thereupon Mr. Hearne, believing that the policy covered the round voyage, took it and signed the premium note, which was paid at maturity.

The prayer of the bill was to have the policy so reformed as to describe the voyage from Liverpool to be "to one or more ports in the island of Cuba," &c.

The bill was filed in January, 1871. By their answer the defendants deny that their late president, Mr. Woodbury, who died in July, 1869, made any such agreement or had any such conversations as are stated in the bill. The general replication was filed in June, 1871, and thereupon testimony taken by both parties, which it is not necessary to recapitulate, as the positive statements of the witnesses for the complainants, fully sustaining the charges in the bill, were not directly contradicted by the evidence put in by the defence. The cause was heard upon bill, answer and proofs.

*A. A. Strout*, for the complainants.

The action of the court now invoked by us is frequently exercised. 1 Parsons on Mar. Ins., 150, and cases cited. *Henckle v. Royal Ass. Co.*, 1 Vesey, 314; *Moteaux v. London Ass. Co.*, Atk., 545; *Collett v. Morrison*, 12 Eng. L. & Eq., 171; *An-*

*drews v. Essex Ins. Co.*, 3 Mason, 10 ; *Tucker v. Madden*, 44 Maine, 215.

*J. & E. M. Rand,* for the defendants.

The strongest evidence is necessary to show such a mistake as will authorize this court to alter the terms of a written instrument. 1 Story's Eq. Jur., §§ 152, 157, and numerous cases. And it must be shown by the same weight of evidence that the mistake is mutual ; that of both parties. Kerr on Fraud and Mistake, 409, note ; 418 *et seq ; Sawyer v. Hovey*, 3 Allen, 331 ; *Lyman v. Ins. Co.,* 17 Johns, 374. No evidence that the Insurance Company ever understood this policy was to be as the plaintiffs assert ; this is expressly denied in the answer ; and nobody ever heard that there was any error in the policy during Mr. Woodbury's life time.

The bill proceeds solely upon the ground of mistake, and to sustain it a mutual mistake must be proved.

WALTON, J. This is a bill in equity asking the court to reform an insurance policy. The authority of the court to grant the relief prayed for is conceded. The only question is whether the evidence of mistake is such as to justify the court in exercising its authority.

It seems to be proved beyond reasonable doubt that the owners of the bark, Maria Henry, obtained for her a charter in Liverpool, requiring her to proceed to some safe port in Cuba, Havana excepted, there to discharge her outward cargo, and at that port, "or at one other usual place in the island," to take in a return cargo, and thence return to Europe; that after this charter had been obtained, and after the vessel had sailed in pursuance of it, one of the owners living in Portland, applied to the president of the Ocean Insurance Company for an insurance of $5000 on this charter ; that he told the president of the insurance company that no copy of the charter had been received, and that he did not know what ports in Cuba it required the vessel to use ; that he wanted a policy that would cover the round voyage; and that the president agreed to give him one ; that he afterwards called at the

office of the insurance company and signed an application for the insurance and received a policy and carried it away without stopping to read them, not doubting, as he testifies, that they had been prepared so as to cover the round voyage, as the president of the company had promised him they should be; that it was afterwards discovered that neither the application nor the policy was so written as to cover the round voyage; that they limited the vessel to the use of one port only in the island of Cuba, whereas the charter required her, if necessary, to use two; that the vessel did in fact use two ports of the island, one to discharge her outward cargo, and one other to take in a return cargo, and that she was afterward lost on her return voyage.

As there can be no recovery upon the policy as it is now written, for the reason that between the voyage insured and the one actually made by the vessel, there would be apparently a fatal deviation, the plaintiffs ask to have the policy reformed so that it will describe the voyage correctly.

We think the relief prayed for should be granted. Where, as in this case, an insurance company undertakes to insure the charter of a vessel, after being informed that no copy of the charter has been received, and it is not known how many ports she will be required to use, and through mistake the policy is so written as to limit the vessel to the use of one port, when in fact her charter requires her to use two, we think a court of equity should order the policy reformed, so as to make it describe the voyage correctly.

The mistake in this case seems to be established beyond the possibility of doubt. The policy and the charter are both written instruments. A comparison of the two demonstrates that the voyage described in the charter is misdescribed in the policy. Can there be any doubt that this misdescription was the result of mistake? We think not. It is impossible to believe that the applicant for insurance knowingly paid the premium for a void policy. Nor would it be just to the officers of the insurance company to suppose that they took a premium for a policy known to them to

be of no value. The conclusion is therefore inevitable that the misdescription was the result of mistake—a mutual mistake—a mistake in which both parties participated; and we think equity and good conscience require that it should be corrected.

*Decree, reforming the policy,*
*as prayed for in the bill,*
*with costs.*

APPLETON, C. J., CUTTING, DICKERSON, DANFORTH and VIRGIN, JJ., concurred.